# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

―――――――――

№ 12-CV-3370 (JFB)(AKT)

―――――――――

CRAIG J. CHILLEMI,

Plaintiff,

VERSUS

THE TOWN OF SOUTHAMPTON, ERIC SICKLES,
JAMES KIERNAN, AND THOMAS TULLY,

Defendants.

―――――――――

**MEMORANDUM AND ORDER**
December 20, 2017

―――――――――

JOSEPH F. BIANCO, District Judge:

Plaintiff Craig Chillemi ("Chillemi" or "plaintiff") brings this action against defendants the Town of Southampton ("the Town") and Officer Eric Sickles ("Officer Sickles" or "Sickles"), Lieutenant James Kiernan ("Lieutenant Kiernan" or "Kiernan"), and Detective Thomas Tully ("Detective Tully" or "Tully") (together with the Town, "defendants"), arising out of Officer Sickles's arrest of Chillemi on July 8, 2009 in Hampton Bays, New York. Chillemi brings claims pursuant to 42 U.S.C. § 1983 ("Section 1983" or "§ 1983") for the alleged violations of his Fourth, Fifth, and Fourteenth Amendment rights. Chillemi asserts claims

for false arrest/false imprisonment, unreasonable search and seizure, fabrication of evidence, compelled self-incrimination, and *Monell* liability.[1] More specifically, in connection with his arrest for unlicensed operation of a motor vehicle and possession of a controlled substance, plaintiff alleges that defendants fabricated evidence against him in order to end his relationship with Detective Tully's daughter. (*See* Decl. in Opp. re Mot. for Summary Judgment, ECF No. 81, "Chillemi Decl.," at ¶ 26 ("Officer Sickles, Lieutenant Kiernan, and Detective Tully fabricated evidence that led to my arrest and the subsequent charges brought against me in an attempt to end my

―――――――――

[1] In his opposition, Chillemi clarifies that he did not intend to bring an Equal Protection claim. (Pl.'s Mem. of Law in Opp. to Mot. for Summary Judgment ("Pl.'s Mem."), ECF No. 83, at 18.)

Chillemi's complaint also included a conspiracy claim brought under 42 U.S.C. § 1985(3), (Compl. ¶¶ 55-58), which the Court dismissed for failure to

state the requisite "racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action," *Chillemi v. Town of Southampton*, 943 F. Supp. 2d 365, 382 (E.D.N.Y. 2013) (quoting *Arteta v. County of Orange*, 141 F. App'x 3, 8 (2d Cir. 2005)).

relationship with Tara Tully. The evidence they fabricated was: that I was driving a vehicle, had drugs in my possession, and made incriminating statements. I did not make any incriminating statements; I was not driving a vehicle; and I did not possess any drugs at the time of my false arrest. Anything to the contrary was fabricated.").)

Presently before the Court is defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth in detail below, the Court grants the motion on the compelled self-incrimination claim and on all claims against Tully, but denies the motion in all other respects because of genuine disputes of material fact that exist with respect to the remaining claims against defendants Sickles, Kiernan, and the Town.

In particular, as a threshold matter, the Court concludes that, although defendants argue that the claims are barred by Chillemi's guilty plea to lesser charges arising from the arrest, construing the evidence most favorably to plaintiff, his guilty plea may have been involuntary because plaintiff may have entered the plea based upon the erroneous belief that his plea would not impact his ability to remain in the work release program. Plaintiff has stated that he entered the plea based upon that understanding and the colloquy at the plea proceeding, which certainly creates an ambiguity as to whether such an understanding among the parties to that effect existed. Thus, plaintiff has set forth sufficient evidence to create a disputed issue of material fact that precludes summary judgment on this issue.

With respect to the false arrest claim, plaintiff argues that he was arrested by Sickles on fabricated misdemeanor charges of unlicensed operation of a motor vehicle and possession of cocaine because Sickles did not like the fact that Chillemi was dating Tara Tully ("Tara"[2]), who is the daughter of Detective Tully. More specifically, Chillemi has submitted a sworn statement that he was not even driving the vehicle on the night in question, and that Sickles also falsely claimed that he had a bag of cocaine in his possession. Tara also has stated under oath that she was driving the car, not Chillemi. Thus, plaintiff has created a genuine issue of disputed fact as to whether there was probable cause for Sickles to arrest him on July 8, 2009. Those same disputed issues of fact preclude summary judgment on the claim that the pat-down at the time of his arrest was an unconstitutional search, as well as on the fabrication of evidence claim relating to the allegations that Sickles falsely claimed that Chillemi was driving the vehicle, had cocaine in his possession, and confessed.

Although defendants argue that Kiernan is entitled to summary judgment because he had no personal involvement in the allegedly unconstitutional actions by Sickles, the Court disagrees. There is evidence that Kiernan arrived at the scene shortly after the arrest and administered the oath for the General Traffic Complaint and Misdemeanor Information signed by Sickles on July 8, 2009. As to Kiernan's knowledge of the allegedly unconstitutional nature of Sickles's search and arrest, plaintiff relies upon the involvement of both Sickles and Kiernan in his 2007 arrest and the circumstances surrounding that encounter, as well as the fact that Tara told Chillemi that Kiernan is her godfather. Moreover, Chillemi disputes Kiernan's claim that, during the July 2009

---

[2] To prevent confusion with defendant Thomas Tully, the Court refers to Tara Tully by her first name.

arrest, Chillemi tried to make a deal with him to avoid arrest. Thus, Chillemi asserts that Kiernan fabricated incriminating statements by Chillemi at the scene of the arrest. Construing the evidence most favorably to plaintiff, there is an issue of fact as to whether Kiernan was aware that Sickles was fabricating evidence against Chillemi on July 8, 2009 and failed to intervene to prevent the alleged constitutional violation, and whether Kiernan fabricated incriminating statements by Chillemi.

These same disputed issues of fact preclude summary judgment in favor of defendants Sickles and Kiernan at this stage on grounds of qualified immunity. In other words, if a rational jury credits as plaintiff's version of the events and finds that Sickles fabricated evidence against Chillemi during the course of an unconstitutional search and arrest, and Kiernan became aware of the unconstitutional nature of the arrest and failed to intercede at the scene to prevent any further unlawful detention, no qualified immunity would exist for either defendant.

With respect to defendant Tully, the Court concludes that summary judgment is warranted in his favor on all claims because there is simply no evidence in the record of his personal involvement in any of the alleged unconstitutional acts by Sickles, or that he was in a position to intercede during the arrest. Although plaintiff speculates that he may have been involved because of an alleged desire to prevent his daughter from dating Chillemi, such speculation is insufficient to overcome a motion for summary judgment. In short, even construing the evidence most favorably to plaintiff, no rational jury could find Tully

responsible for the alleged unconstitutional acts of Sickles on July 8, 2009.

Finally, because plaintiff does not allege that he made any statements to the police following his arrest, he cannot have a compelled self-incrimination claim. Although he does assert that Sickles fabricated a confession in order to support the arrest, that allegation should proceed (as noted above) as a fabrication of evidence claim. Accordingly, summary judgment is granted on the compelled self-incrimination claim.

## I. BACKGROUND

### A. Factual Background

The Court takes the following facts from Chillemi's and defendants' respective Rule 56.1 Statements of Fact, and any admissible affidavits, depositions, and exhibits.[3] The Court construes the facts in the light most favorable to Chillemi, the nonmoving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005). Where only one party's Rule 56.1 Statement is cited, the other party does not dispute the facts alleged or has offered no admissible evidence to refute that fact.

### 1. Background Information

Plaintiff alleges that his relationship with Detective Tully's daughter, Tara, and Sickles's desire to date Tara, led to his being targeted for arrest by defendants, both in 2007 and in 2009.

At the time of the relevant arrests in this case, Chillemi was involved in a romantic relationship with Tara. (Defendants' Rule 56.1 Statement ("Defs.' 56.1") ¶¶ 2, 25, 29, 42, 53.) Tara was the "estranged" daughter

---

[3] Although the Rule 56.1 Statements of Fact ("56.1 statements") contain specific citations to the record, the Court cites primarily to the statements rather than to the underlying citations.

of defendant Tully, a detective in the police unit that arrested Chillemi in 2007 and again in 2009. (*Id.* ¶¶ 1, 7, 26, 29, 51, 59, 63.)

Chillemi never met or interacted with defendant Tully. (Defs.' 56.1 ¶ 4.) Although Tully was not involved in the investigation into Chillemi's alleged drug sales or either of his arrests, (*id.* ¶¶ 106-07), Chillemi alleges that Sickles "arrested Chillemi because Chillemi was dating a police officer's daughter," (Plaintiff's Rule 56.1 Statement ("Pl.'s 56.1") ¶ 90). Chillemi more broadly attributes this motive to all defendants, "claim[ing] that he was arrested due to the defendants' disapproval of his romantic relationship with Defendant Tully's daughter." (Defs.' 56.1 ¶ 99.)

Tara was not only estranged from her father, but she also had not lived with him since she was born. (*Id.* ¶ 100.) Tully claims that he did not know Chillemi and Tara were dating until after Chillemi's 2009 arrest, (*id.* ¶ 101), but Tara disputes this fact, (Pl.'s 56.1 ¶ 101 (citing Defs.' Mem. of Law in Supp. of Mot. for Summary Judgment ("Defs.' Mem."), ECF No. 80, Ex. M ("Tara Tully Tr.") at 72 (claiming "[her father] knew" they were dating in 2009))).

Tully was not involved in any investigation into Chillemi's alleged drug sales, (Defs.' 56.1 ¶ 106), and he was not present at the scene of either of Chillemi's arrests by the Southampton Town Police Department ("SHTPD"), (*id.* ¶ 107.) Although it is uncontroverted that Tully had no involvement in Chillemi's arrests, Chillemi disputes the claim that Tully had no knowledge of Chillemi prior to this lawsuit. (Pl.'s 56.1 ¶ 99.)

The three individual defendants were all members of the SHTPD, which was the department involved in the arrest of Chillemi both in 2007 and 2009. (Defs.' 56.1 ¶¶ 7, 12, 14.) Kiernan and Sickles both worked in the Street Crimes Unit ("SCU"), and Kiernan was the supervising sergeant of the SCU during this period. (*Id.* ¶¶ 12, 14.) Tully had previously worked in the SCU, but was a detective in another unit during the relevant period. (*Id.* ¶ 12; Defs.' Mem., Ex. L ("Thomas Tully Tr.") at 8-9.)

Tara stated that she knew Kiernan through her father. (Defs.' 56.1 ¶ 7.) Kiernan also admitted this connection with Tara, and that he "kn[ew] that she was Chillemi's girlfriend at the time of the underlying events." (*Id.* ¶¶ 8-9.) Kiernan said that he did not, however, "know [Tara] on a personal level." (*Id.* ¶ 9.) Sickles stated that he knows Tara as Tully's daughter, and "knew of" Tara in August 2007. (*Id.* ¶ 11.) Defendants assert that Tully never had conversations with Kiernan or Sickles about Tara dating Chillemi. (*Id.* ¶¶ 102, 104.)

Chillemi also alleges that his arresting officer (Sickles) had a romantic interest in Tara. (Pl.'s 56.1 ¶ 90 (explaining that "Sickles arrested Chillemi because . . . Sickles ha[d] a romantic interest in Tara Tully; Sickles asked Tara Tully on a date both before and after Chillemi's 2009 arrest"); Defs.' 56.1 ¶ 91.) Tara testified that she had a couple of interactions with Sickles after Chillemi's arrest that made her "uncomfortable," and that Sickles "asked her out on a date 'like twice.'" (Defs.' 56.1 ¶¶ 92-93.) She said that she did not take it entirely seriously, but it made her feel uncomfortable. (*Id.* ¶ 93.)

2. Chillemi's August 2007 Arrest

Chillemi was first arrested by the SHTPD on August 5, 2007 and charged with several counts of drug possession and sale. (*Id.*

¶¶ 25, 29, 34.) It was while furloughed[4] from his resulting 2007 sentence that Chillemi was arrested again in 2009, by the same police unit, and subjected to the alleged civil rights violations that gave rise to the instant complaint. (*Id.* ¶ 52.)

The SHTPD unit that arrested Chillemi both times was the SCU, a plain-clothes, primarily narcotics unit.[5] (*Id.* ¶ 12.) The SCU began investigating Chillemi in 2007 for "doing drugs and selling drugs" out of his home in Southampton. (*Id.* ¶¶ 21-22.) Undercover SCU officers purchased cocaine from Chillemi "[o]n two or three separate occasions." (*Id.* ¶ 23.) The Town then obtained a search warrant, and the SCU and the Town's Emergency Services Unit ("ESU") executed a lawful search of Chillemi's home on August 5, 2007.[6] (*Id.* ¶¶ 24-27.)

At the time of his 2007 arrest, Chillemi was living with Tara[7] and two other roommates. (*Id.* ¶ 25.) Chillemi and Tara were home along with one of their roommates and another man when "at least ten" police officers from the SCU and ESU arrived at their house to execute the search warrant. (*Id.* ¶¶ 26-27.) Chillemi was the first removed from the house; Sickles arrested him. (*Id.* ¶ 31.) Defendants assert that all four occupants were arrested, and that Tara was brought to the police station, questioned, and processed, but was not charged. (*Id.* ¶¶ 29, 32.) Chillemi disputes

this fact, contending that Tara had not been arrested in the first place. (*Id.* ¶ 29.)

Tully was not present at the raid on the house or at the police station. (*Id.* ¶ 30.) Tara has no knowledge that her father was "involved in any way," or that charges were brought against Chillemi because her father wanted to end their relationship. (*Id.*) As to defendant Kiernan's involvement, it is undisputed that Kiernan did not talk to Tara at the time of this first arrest. (*Id.* ¶ 32.)

The police recovered "heroin, cocaine, and some pills" from their 2007 search. (*Id.* ¶ 34.) Chillemi pleaded guilty to the sale of a controlled substance and criminal possession of a controlled substance in the third degree and was sentenced to four years in prison. (*Id.* ¶ 35.) Chillemi never made complaints to the SHTPD about "anything that happened in the course of his August 5, 2007 arrest before pleading guilty." (*Id.* ¶ 36.)

### 3. Furloughed on Work Release

Chillemi was furloughed in or around March or April 2009 and entered a work release program. (Pl.'s 56.1 ¶¶ 37, 40; *see also supra* note 5.) Before his release, Chillemi completed a six-month drug counseling/rehabilitation program. (Defs.' 56.1 ¶ 38.) Chillemi was required to have a stable address in order to participate in the program. (*Id.* ¶ 41.) When Chillemi was released, he and Tara began living together in Manorville, NY, and he began working full-

---

[4] Defendants adopted Chillemi's terminology from his 56.1 statement—Chillemi explained that "furlough" rather than "parole" was the correct term to describe his release from prison—thereby resolving the dispute between the parties' statements of facts. (Defs.' Mem. at 3 n.3.)

[5] Defendants claim in their 56.1 statement that the SCU was disbanded in 2011 due to a personnel shortage, (Defs.' 56.1 ¶ 12), but Chillemi disputes this

fact, (Pl.'s 56.1 ¶ 12). This dispute is immaterial to resolution of the instant motion.

[6] Chillemi does not challenge the legality of the 2007 search. (*Id.* ¶ 36.)

[7] Chillemi and Tara began dating in February 2007, and started living together in or around April of that year. (Defs.' 56.1 ¶¶ 2-3.)

time in an industrial cleaning job. (*Id.* ¶¶ 42-44.) Chillemi began to earn additional free time and was eventually home for five days for every two nights that he had to return to Lincoln Correctional Facility. (*Id.* ¶ 45.) During this period, Chillemi reported to a parole officer or "somebody like a parole officer." (*Id.* ¶¶ 47; Pl.'s 56.1 ¶ 47.)

4. Chillemi's July 2009 Arrest

According to defendants, Sickles became aware that Chillemi was no longer incarcerated during the summer of 2009; informants told undercover officers that Chillemi was out of prison and dealing drugs again. (Defs.' 56.1 ¶¶ 48, 50.) The SCU identified Chillemi as "a relatively big drug dealer," so he was "never off their radar." (*Id.* ¶ 49.)

On July 8, 2009, Chillemi was out on furlough. (*Id.* ¶ 52.) Chillemi went out to lunch with Tara and a friend, Jason Incardona, and then Chillemi and Tara drove Incardona back to his house after lunch. (*Id.* ¶¶ 53, 54.) The group drove to and from lunch in a car that Chillemi had rented, but which Chillemi claims Tara drove even though she was not on the rental agreement. (*Id.* ¶¶ 53, 54; Pl.'s 56.1 ¶ 58.)

Here, the versions of events diverge: Sickles asserts that he observed Chillemi driving, with Tara in the passenger seat. (Defs.' 56.1 ¶ 58.) Defendants also contend that the SHTPD had run Chillemi's license a few days earlier and it had come back suspended. (*Id.* ¶ 60.) The SHTPD had tried to follow Chillemi on another occasion, and Sickles asserts that he knew that Chillemi had a suspended license on the date of his arrest. (*Id.* ¶¶ 59-60.) Chillemi disputes that he had a suspended license at the time; rather, he has submitted a sworn statement that he had a valid interim license in his pocket that "was completely disregarded by Officer Sickles." (Chillemi Decl. ¶¶ 12, 14.) Moreover, Chillemi disputes that he was driving the car at all on the day in question and, instead, asserts that Tara was driving. (*Id.* ¶ 13.) Tara also has testified that she was driving the vehicle on July 8, 2009, not Chillemi. (Tara Tully Tr. at 45.) Chillemi further asserts that he and Incardona went into Incardona's house when they returned from lunch, and that Tara waited outside in the car for a couple of minutes before an unmarked police car pulled up to the house. (*Id.* ¶¶ 55-56.)

Contrary to Chillemi, Sickles states that he followed Chillemi and caught up to him "as Chillemi arrived at Incardona's house." (Defs.' 56.1 ¶ 61.) Sickles further contends that he got out of the car, had a conversation with Chillemi, and placed Chillemi under arrest for aggravated unlicensed operation of a motor vehicle. (*Id.* ¶¶ 62-63.) The exact timing is unclear, but when the SHTPD ran Chillemi's license after his arrest, it was listed as "suspended." (*Id.* ¶ 60 (citing Defs.' Mem., Ex. F ("NYSID Report") at 2).) Chillemi, as noted above, claims that his license was not suspended at the time of the July 8, 2009 arrest. (Pl.'s 56.1 ¶ 57.)

Sickles further asserts that he then searched Chillemi incident to arrest and found a bag of cocaine inside Chillemi's right side pants pocket.[8] (Defs.' 56.1 ¶¶ 63-64.) Chillemi disputes Sickles's account; he claims that "Officer Sickles did not find a bag of cocaine on [him] after a search incident to his arrest; Sickles produce [sic] a baggy with white powder in it." (Pl.'s 56.1 ¶ 62.)

---

[8] Sickles, therefore, added a charge of criminal possession of a controlled substance to the other charges. (*Id.* ¶ 63.)

Chillemi also contends that Sickles told him that "he had waited to arrest [him] until [he] was with Tara Tully." (Chillemi Decl. ¶ 16.)

### 5. Chillemi's Alleged Post-Arrest Statements

By the time defendant Kiernan reported to the scene, Chillemi was already handcuffed and under arrest. (Defs.' 56.1 ¶¶ 66-67.) Kiernan asserts that he was aware that Incardona, who lived in the house where the arrest took place, was addicted to pills. (*Id.* ¶ 66.) Sickles showed Kiernan the bag of drugs he had found on Chillemi. (*Id.* ¶ 67.)

Kiernan contends that Chillemi "asked to speak with [him], and was trying to cut a deal so he wouldn't be arrested and reported to the work release program." (*Id.* ¶ 68.) In addition, according to defendants, "Chillemi made oral admissions at the scene at the time of the arrest; Sickles prepared a supplementary report memorializing them. Chillemi said: 'I don't even think that coke is real. I made a fake bag up for someone.' The second admission was made to Kiernan, but Sickles overheard it: 'I'm just getting started again. I barely have an ounce.'" (Defs.' 56.1 ¶ 70.) Chillemi disputes these facts, and asserts that he made no such statements to Sickles or Kiernan. (Pl.'s 56.1 ¶¶ 68-70 (citing Defs.' Mem., Ex. H ("Chillemi Tr.") at 48:2-13, 56:13-21; Chillemi Decl. ¶ 17.)

Chillemi was charged with possession of cocaine and aggravated unlicensed operation of a motor vehicle, both misdemeanors. (Defs.' 56.1 ¶ 75.) Chillemi was transported to headquarters for processing, (*id.* ¶ 71), and Tara was sent home, (*id.* ¶ 72).

### 6. Sickles's Alleged Proposition and the SCU's "Sign Off"[9] on the Arrest

Chillemi also asserts that Sickles spoke to Tara in a condescending way during the arrest. (*Id.* ¶ 91.) Chillemi further states that Sickles was propositioning Tara for a date, and that he said "something to the effect of, 'hey, after this do you want to get something to eat?'" (*Id.*) Chillemi contends that Sickles had seen him driving a few times before his arrest, but had waited until Tara "was there to see it" to arrest him. (*Id.* ¶ 94.) Chillemi also asserts that Sickles told him "something to the effect of, 'I can't believe you are home [from prison] so soon.'" (*Id.*)

Chillemi further alleges that defendants Kiernan and Tully "knew that the statements made by Officer Sickles in the General Traffic Complaint and Misdemeanor Information were knowingly false." (Compl. ¶¶ 32-33.) These statements included that Sickles had seen Chillemi driving the car (rather than Tara), and that he found a bag of cocaine in Chillemi's pocket. (Compl. ¶¶ 28-29.) Chillemi contends that Kiernan supervised Sickles and "signed off" on Sickles's improper conduct, including when Sickles "pull[ed] up on private property without probable cause and ma[de] false claims against him." (Defs.' 56.1 ¶ 87.) Kiernan administered the oath on the General Traffic Complaint. (Chillemi Decl., Ex. 2.) Chillemi also alleges that Tully was a supervisory officer who "knowingly acquiesced" to Sickles's unlawful arrest. (*Id.* ¶ 88.) Chillemi believes that Sickles worked under Tully, and that the arrest "amounted to Tully's personal wishes being carried out." (*Id.*) Offering further support for his claims

---

[9] Chillemi objects to the facts presented in this section of defendants' 56.1 statement to the extent that they call for a legal conclusion, but he does not object to the content of the statements. (Pl.'s 56.1 ¶¶ 87-88.)

that defendants were aware of the impropriety of the arrest, Chillemi states that he heard other officers say that "they had to arrest Chillemi because he was dating a cop's daughter." (*Id.* ¶ 89.)

### 7. Chillemi's Plea Deal and Removal From Work Release

Chillemi was incarcerated for three and a half months while awaiting disposition of the charges from his 2009 arrest. (*Id.* ¶ 75.) Chillemi did not go to trial but instead, on or around October 29, 2009, pleaded guilty to unlawful possession of marijuana and facilitating aggravated unlicensed operation of a motor vehicle. (*Id.* ¶ 78.) Chillemi claims that his plea was not voluntary, and that he took the plea because, "as it was explained to him by the judge in the Court, he would be able to return to the work release program." (*Id.* ¶ 79.)

The transcript shows that, during the plea, defense counsel (Mr. Ghanayem) stated for the record that the disposition was generous and made reference to the fact that Chillemi wanted to return to the work release program, and the prosecutor (Mr. Mashhadian) confirmed the accuracy of defense counsel's statement:

> Mr. Ghanayem: And Your Honor, I would also like to put on the record that this is a generous disposition and it gives my client -- to maintain a work release program, which he has been doing very well in. We have talked about this with his family and he is very anxious to get back to that. . . . I just wanted to make sure that I recorded that.

> Mr. Mashhadian: That's correct.

(Defs.' Mem., Ex. G ("Tr. of Plea") at 4.) Defense counsel also stated at a later point in the plea hearing that, after the sentence, Chillemi "should be sent back to the work release program." (*Id.* at 5.) Moreover, Chillemi simply uttered the word "guilty" after reference to statutory citations for "two violations," and did not explain what he did that made him guilty of those violations. (*Id.*)

After his plea, Chillemi was sent back to Lincoln Correctional Facility. (Defs.' 56.1 ¶ 83.) After two weeks, he was given a hearing before the Temporary Release Committee[10] ("TRC") at which an officer read the July 8, 2009 arrest report, including the original charges. (*Id.* ¶ 84.) Chillemi tried to explain that he did not plead guilty to a felony or misdemeanor, and that "he expected to be reinstated to work release because he was doing so well there." (*Id.*) The TRC denied this request, and Chillemi was sent back to prison. (*Id.* ¶ 85.) Chillemi appealed the decision, but was unsuccessful. (*Id.* ¶ 86.)

Chillemi was ultimately released early on or about December 31, 2010, due to time credited while awaiting disposition of the charges stemming from his 2009 arrest. (*Id.*) Defendants claim that Chillemi "didn't serve any additional jail time as a result of the July 8, 2009 arrest." (*Id.*) Chillemi disputes this statement, clarifying that although no days were added to his 2007 sentence, his work release privilege was suspended as a result of this arrest. (Pl.'s 56.1 ¶ 86.) As is relevant to the parties' dispute over the validity of Chillemi's guilty plea, the period between Chillemi's July 8, 2009 arrest and his release

---

[10] Defendants adopted Chillemi's terminology from his 56.1 statement—Chillemi explained that the correct term is TRC rather than "parole board"—

thereby resolving the dispute between the parties' statements of facts. (Defs.' Mem. at 4-5.)

from prison on December 31, 2010 was approximately a year and a half.

## B. Procedural Background

Chillemi commenced this action before the Honorable Arthur D. Spatt on July 9, 2012. Defendants filed a motion to dismiss for failure to state a claim on August 30, 2012. Chillemi filed his opposition on October 5, 2012; defendants replied on November 8, 2012; and the Court issued its decision on the motion, granting it in part and denying it in part, on May 4, 2013. Specifically, the Court denied defendants' motion to dismiss Chillemi's 42 U.S.C. § 1983 claims, but granted defendants' motion to dismiss his possible claims stemming from the August 5, 2007 arrest and/or March 28, 2008 conviction and his 42 U.S.C. § 1985(3) conspiracy claims.

Defendants answered the complaint on May 23, 2013. Defendants filed a motion for summary judgment on September 23, 2016. Chillemi filed his opposition to the motion for summary judgment on November 7, 2016, and defendants replied in support of their motion on November 22, 2016. Judge Spatt recused himself on March 3, 2017, denying the pending motion for summary judgment without prejudice and with leave to renew upon reassignment of the case. The case was reassigned to the undersigned, and defendants renewed their motion for summary judgment on March 21, 2017. The Court held oral argument on June 6, 2017. The matter is fully submitted.

## II. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013). The moving party bears the burden of showing that he is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (alteration in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be

granted." 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

## III. DISCUSSION

Defendants move for summary judgment on all remaining causes of action. Specifically, defendants argue that: (1) Chillemi's claims are precluded by his guilty plea; (2) Chillemi cannot establish the elements of his § 1983 claims for false arrest, unlawful search incident to arrest, and compelled self-incrimination; and (3) Chillemi cannot show that the SHTPD or the Town had a custom, policy, or practice that led to his injury, as is required to establish *Monell* liability against the Town.[11]

## A. Effect of Chillemi's Guilty Plea on Claims in this Action

Defendants argue that Chillemi's guilty plea precludes him from being able to assert in this litigation that his arrest lacked probable cause. As discussed below, the Court concludes that there are disputed issues of material fact on the issue of whether Chillemi's guilty plea was knowing and voluntary that preclude summary judgment on this ground.

### 1. Preclusive Effect of a Guilty Plea on Later Claims

In *Cameron v. Fogarty*, the Second Circuit found that the common-law rule that a plaintiff "can under no circumstances recover if he was convicted of the offense for which he was arrested" applied to bar § 1983 actions asserting false arrest. 806 F.2d 380, 387 (2d Cir. 1986) (citing *Broughton v. State*, 37 N.Y.2d 451, 458 (1975)). The Second Circuit explained that, in such cases, courts will accept the fact of the conviction as "conclusive evidence of the good faith and reasonableness of the officer's belief" that the arrest was lawful. *Id.* at 388. The Second Circuit has also stated that this rule applies to bar false arrest claims in cases where the prior conviction resulted from a guilty plea, *Maietta v. Artuz*, 84 F.3d 100, 102 n.1 (2d Cir. 1996), and even in cases where the defendant pleaded guilty to a lesser charge, *Timmins v. Toto*, 91 F. App'x 165, 166 (2d Cir. 2004); *see also McNeill v. People of City & State*, No. 06-CV-4843 (NGG), 2006 WL 3050867, at *3 (E.D.N.Y. Oct. 24, 2006), *aff'd sub nom. McNeill v. People of City & State of New York*, 242 F. App'x 777 (2d Cir. 2007).

The Second Circuit has not, however, addressed whether an *involuntary* guilty plea would bar false arrest claims. Some district courts have addressed this issue, finding that the claims would not be barred. In *Unger v. Cohen*, the court determined that an invalid judgment of conviction would not serve to

---

[11] The Court does not address Chillemi's Equal Protection claim because he abandoned it in his opposition. (Pl.'s Mem. at 18.)

bar false arrest claims. 718 F. Supp. 185, 187 (S.D.N.Y. 1989). The court pointed out that, in establishing the general rule that plaintiffs cannot recover for false arrest if they were convicted, the Second Circuit in *Cameron* cited the Restatement for the rule that a "conviction . . . conclusively establishes the existence of probable cause, *unless the conviction was obtained by fraud, perjury or other corrupt means*." *Id.* (quoting *Cameron*, 806 F.2d at 387 (quoting Restatement § 667(1))). The *Unger* court, therefore, found that a plaintiff could rebut the "conviction defense"—that he or she had been convicted as a bar against a false arrest claim—by "establishing that the conviction was invalid." *Id.* at 187. The court explained that, if a guilty plea is invalid it "thus does not conclusively establish the existence of probable cause for his arrest." *Id.* at 188.

These precise issues were raised by defendants in a motion to dismiss in this case, which was denied by Judge Spatt (before the case was re-assigned to the undersigned). *See Chillemi v. Town of Southampton*, 943 F. Supp. 2d 365, 377 (E.D.N.Y. 2013) (citing *Unger*, 718 F. Supp. at 187). In particular, defendants argued: (1) that plaintiff was barred from bringing the lawsuit based upon the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994), because his claims here would implicate the validity of his underlying conviction; (2) plaintiff's claims were barred by his guilty plea, which established probable cause for his arrest; and (3) plaintiff was collaterally estopped from challenging his arrest because he has pled guilty and there has been no invalidation of that conviction. Judge Spatt denied the motion to dismiss on each of these grounds. First, Judge Spatt held that an exception to the *Heck* rule applied because plaintiff was only assessed a fine, and given that he was not "in custody," had no ability to challenge his arrest and conviction through habeas corpus. *Id.* at 375-76. Second, Judge Spatt

held that the guilty plea did not bar his claims because the fact of a conviction is an affirmative defense, and plaintiff was claiming the guilty plea was involuntary. *Id.* at 377-78. The Court noted that the question of the voluntariness of Chillemi's guilty plea "is a matter for another day." *Id.* at 378. Finally, Judge Spatt similarly concluded that, because Chillemi was contesting the legitimacy of the guilty plea, "issues of collateral estoppel cannot be determined at this time." *Id.* at 379.

2. Validity of a Guilty Plea

Given the completion of discovery, the Court now considers whether Chillemi has submitted evidence that raises genuine disputed issues of material fact as to the validity of his guilty plea.

a. Legal Standard

The well-established standard for determining the validity of a guilty plea is "whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)). The Supreme Court has held that, under the Due Process Clause, a trial court can only accept a guilty plea which is "done voluntarily, knowingly, and intelligently, 'with sufficient awareness of the relevant circumstances and likely consequences.'" *United States v. Adams*, 448 F.3d 492, 497 (2d Cir. 2006) (quoting *Bradshaw v. Stumpf*, 545 U.S. 175, 183 (2005)); *accord Godinez v. Moran*, 509 U.S. 389, 400 (1993). Indeed, a "plea of guilty entered by one fully aware of the direct consequences of the plea is voluntary in a constitutional sense unless induced by threats, mis-representations, or perhaps by promises that are by their nature improper." *Bousley v. United States*, 523 U.S. 614, 619 (1998) (internal alteration and citations omitted).

Normally, a guilty plea may not be collaterally attacked because it constitutes an admission as to all elements of the charged crime. *Salas v. United States*, 139 F.3d 322, 324 (2d Cir. 1998). However, a defendant may challenge a guilty plea on the ground that it was not made knowingly and voluntarily. *United States v. Simmons*, 164 F.3d 76, 79 (2d Cir. 1998).

In cases where a challenge to a guilty plea is based on ineffective assistance of counsel, the Supreme Court has held that the two-part test set forth in in *Strickland v. Washington*, 466 U.S. 668 (1984), applies. *Hill*, 474 U.S. at 58. The Court ruled that *first*, "the defendant must show that counsel's representation fell below an objective standard of reasonableness," and *second*, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* (quoting *Strickland*, 466 U.S. at 687-88, 694); *see also id.* at 56 ("Where . . . a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends upon whether counsel's advice was within the range of competence demanded of attorneys in criminal cases.") (citations omitted).

In discussing the first prong of the *Strickland* test—demonstrating that "counsel's representation fell below an objective standard of reasonableness"—the Supreme Court has stated that "[i]n applying and defining this standard *substantial deference* must be accorded to counsel's judgment." *Premo v. Moore*, 562 U.S. 115, 126 (2001) (citing *Strickland*, 466 U.S. at 689) (emphasis added); *see also Pratt v. Greiner*, 306 F.3d 1190, 1196 (2d Cir. 2002) ("[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act

or omission of counsel was unreasonable."); *Williams v. United States*, No. 07 CV 1804 RJD, 2012 WL 1116403, at *5 (E.D.N.Y. Mar. 30, 2012) ("Actions and/or omissions taken by counsel for strategic purposes generally do not constitute ineffective assistance of counsel.") (citation omitted). However, the Second Circuit has likened the required showing at the summary judgment stage to that required for a hearing on an ineffective assistance of counsel claim, and explained that "[t]o warrant a hearing on an ineffective assistance of counsel claim, the defendant need establish only that he has a plausible claim of ineffective assistance of counsel, not that he will necessarily succeed on the claim." *Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009) (citation omitted).

The second prong of this test, whereby the defendant establishes the "prejudice" that resulted from ineffective assistance of counsel, *Hill*, 474 U.S. at 59, requires "some objective evidence other than defendant's assertions" that counsel's ineffective assistance impacted the outcome of the proceedings, *Pham v. United States*, 317 F.3d 178, 182 (2d Cir. 2003). Prima facie evidence can include, for instance, evidence of a "'significant sentencing disparity' between the sentence offered in the rejected plea and the actual sentence imposed." *Williams*, 2012 WL 1116403, at *6 (quoting *Raysor v. United States*, 647 F.3d 491, 495 (2d Cir. 2011)); *see also Parafan-Homen v. United States*, No. 03-CV-5427 TCP, 2012 WL 4472262, at *13 (E.D.N.Y. Sept. 25, 2012).

b. Analysis

Here, Chillemi contends that his plea was involuntary because he believed that it was a condition of his plea that he would be allowed to return to the work release program and that, if that understanding was erroneous, his

counsel was constitutionally ineffective in advising him of that fact. (Pl.'s Mem. at 11-16.) More specifically, Chillemi argues that the record and transcript clearly show his plea to have been involuntary:

> The record and transcript is completely devoid of any facts that there were long periods of plea negotiations, that [Chillemi] understood the effect of a plea deal, that he understood the effect of uttering the word "guilty," or that [he] understood the statutory citations to which he was pleading guilty. . . . Neither the town justice nor the prosecutor discussed the charges or circumstances surrounding [the] arrest. Additionally, the potential negative consequences of his plea agreement were not discussed during the plea allocution. [T]he plea allocution that was provided was sparse . . . . Th[e] affirmative representation at the time of the plea that Mr. Chillemi would be able to return to the work release program was false. Neither the court nor the prosecutor or even his own attorney for that matter advised Mr. Chillemi of his right to a trial . . . . There is no indication that Mr. Chillemi understood what his guilty plea meant (or its future significance), what rights he was waiving, or that he was pleading guilty because he was, in fact, guilty.

(Pl.'s Mem. at 13-15 (citing Tr. of Plea) (citations omitted).)

Defendants, on the other hand, counter that Chillemi's plea was not involuntary:

> This was not a first time offender, confused by the legal system, pleading guilty within hours of his arrest. . . . He had previously pled guilty. He had well-known, seasoned criminal defense attorneys representing him, and . . . struck a "sweetheart" of a deal given his prior history and the fact that he was on work release at the time of his arrest. . . . No person from the SHTPD was present when Chillemi took the plea; none of the defendant officers were involved or influenced Chillemi's decision making regarding the plea. Neither the Court nor any officer or other official from the Town of Southampton made any representations to plaintiff about plaintiff's ability to participate in work release following his July 8, 2009 arrest. . . . . Moreover, despite counsel's attempt to rewrite plaintiff's criminal attorney's statements at the plea hearing, she never indicated that Chillemi would have *the right* to continue in work release.

(Defs.' Reply Mem. of Law in Supp. of Mot. for Summary Judgment, ECF No. 85, at 5-6 (citing Tr. of Plea; Chillemi Tr. at 53) (citations omitted).)

Having carefully reviewed the record, the Court concludes that there are disputed issues of fact that preclude summary judgment on whether Chillemi's guilty plea was knowing and voluntary. As noted *supra*, the transcript shows that, during the plea, Chillemi's attorney (Mr. Ghanayem) made explicit reference to Chillemi's return to work release, after which the prosecutor confirmed the statement:

> Mr. Ghanayem: And Your Honor, I would also like to put on the record that this is a generous disposition and it gives my client -- to maintain a work release program, which he has been doing very well in. We have

talked about this with his family and he is very anxious to get back to that. . . . I just wanted to make sure that I recorded that.

Mr. Mashhadian: That's correct.

(Tr. of Plea at 4.) The Court notes that there is a key word missing in the statement: "it gives my client -- to maintain a work release program." It is unclear whether this was a transcription error or a lack of clarity by the lawyer. Although plaintiff's counsel suggests that it means Chillemi had the "right" to remain in a work release program under the plea disposition, the Court concludes that the transcript is ambiguous. However, construing the ambiguity in the transcript most favorably to plaintiff, one could conclude that remaining in the work release program was a condition of the plea and that it was confirmed by the prosecutor on the record. Although that is not the only inference that could be drawn from the ambiguity, it is certainly one reasonable inference that could be drawn. Moreover, although defendants suggested that the prosecutor would have no ability to bind a separate agency with respect to the continuation of work release, that lack of authority would not render the plea voluntary if, for whatever reason, it was made a condition of the plea and that condition was not fulfilled.

Chillemi also asserts that, apart from whether remaining in work release was a condition of the plea that was placed on the record, his plea was involuntary because it was his clear understanding, based upon the advice of his attorney, that his work release would not be revoked because of his guilty plea. Chillemi further states under oath that he would have never pleaded guilty if he knew it could have resulted in his removal from work release. Specifically, in his declaration, Chillemi explains:

At my plea allocution on October 29, 2009 before the Honorable Edward D. Burke, I had only one concern: to return to the work-release program. . . . During my plea allocution, I did not admit factual guilt. I only pled guilty to certain statutory citations: 221.05 and 511.0A. During my plea allocution, I only accepted the plea agreement on the false premise that I would be able to return to work release. Had the town justice, prosecutor, or my own attorney told me that a guilty plea would mean that I would be removed from the work release program and placed back into incarceration, I never would have pleaded guilty.

(Chillemi Decl. ¶¶ 19-22.) Chillemi's sworn statement is sufficient to create an issue of disputed fact as to whether his plea was involuntary due to ineffective assistance of counsel. In other words, construing the evidence most favorably to Chillemi, he may be able to satisfy both prongs of the *Hill* standard—the plea was invalid because (1) his counsel's advice fell below the "range of competence" demanded of him, and (2) there was a "reasonable probability that [Chillemi] would not have pleaded guilty" were it not for his counsel's deficient conduct. (Pl.'s Mem. at 12.) Moreover, any mistaken belief that he would return to the work release program would also go to the determination of whether his plea was "knowing," and done "with sufficient awareness of the relevant circumstances and likely consequences." *Adams*, 448 F.3d at 497.

In sum, given the ambiguities in the record, and viewing the facts in the light most favorable to Chillemi, the Court concludes that there is a genuine dispute as to material facts that precludes summary judgment on the question of whether Chillemi's guilty plea was knowing and voluntary.

Accordingly, summary judgment on this ground is denied.

## B. Section 1983 Claims

All of Chillemi's surviving claims in this action were brought pursuant to 42 U.S.C. § 1983 ("Section 1983" or "§ 1983"). Defendants claim that the Court should grant summary judgment on the following grounds: (1) Chillemi failed to establish the necessary elements of his § 1983 claims; (2) these claims fail as to individual defendants Kiernan and Tully because Chillemi did not establish their personal involvement; (3) defendants are entitled to qualified immunity; and (4) Chillemi failed to establish *Monell* liability against the Town. The Court will address each argument in turn.

### 1. Elements of Chillemi's § 1983 Claims

To prevail on a claim under § 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws, (2) by a person acting under the color of state law. 42 U.S.C. § 1983. Section 1983 does not itself create substantive rights; it offers "a method for vindicating federal rights elsewhere conferred." *Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) (citation omitted). Chillemi brings claims under § 1983 for violations of the Fourth, Fifth, and Fourteenth Amendments.

#### a. False Arrest/False Imprisonment Claims

Defendants move for summary judgment on Chillemi's false arrest/false imprisonment claims[12] on the grounds that Chillemi's confinement was privileged because Sickles had probable cause to arrest him, and that probable cause serves as a complete defense to a false arrest claim. As discussed below, genuine disputes of material fact exist as to whether Sickles in fact had probable cause to make the arrest, and preclude summary judgment on this claim.

Under § 1983, a false arrest claim derives from the Fourth Amendment's prohibition against unreasonable searches and seizures. *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006); *see also Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003) (citing *Weyant*, 101 F.3d at 852) ("Claims for false arrest . . . brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for false arrest . . . under state law.").

In order to prevail on a false arrest claim, Chillemi needs to prove the following four elements: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Jocks*, 316 F.3d at 134-35 (quoting *Broughton*, 37 N.Y.2d at 456). The fourth element is the only one in dispute for purposes of the motion.

Probable cause is a complete defense to a false arrest claim. *See Heller v. Bedford Cent. Sch. Dist.*, 144 F. Supp. 3d 596, 622 (S.D.N.Y. 2015) (collecting cases). "The same holds true for [a] false imprisonment claim[] because, under New York law, the claim is identical to a false arrest claim and the federal claim looks to the elements of the state claim." *Killburn v. Village of Saranac Lake*, 413 F. App'x 362, 363 (2d Cir. 2011)

---

[12] The Court focuses its discussion on the false arrest claim because, under New York law, "the tort of false arrest is synonymous with that of false imprisonment," and courts use that tort to analyze an alleged Fourth Amendment violation in the § 1983 context. *Posr v.*

*Doherty*, 944 F.2d 91, 96 (2d Cir. 1991); *see also Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995).

(citations omitted). However, the burden of proving this affirmative defense lies with the defendant because "when an arrest is made without a warrant, the officer has acted outside the scope of the legal process and therefore a rebuttable presumption arises that such an arrest is unlawful." *Rodriguez v. City of New York*, 563 N.Y.S.2d 1004, 1005 (N.Y. Sup. Ct. 1990) (citing *Broughton*, 37 N.Y.2d at 458).

In general, probable cause is established where "the [arresting] officer has 'knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested.'" *Finigan v. Marshall*, 574 F.3d 57, 62 (2d Cir. 2009) (quoting *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007)); *see also Weyant*, 101 F.3d at 852 (citing *Dunaway v. New York*, 442 U.S. 200, 208 n.9 (1979) (additional citations omitted)). Furthermore, the propriety of an arrest does not depend on whether the suspect was ultimately found guilty, but, rather, on the existence of probable cause at the time of the arrest. *See Haussman v. Fergus*, 894 F. Supp. 142, 147 (S.D.N.Y. 1995) (citing *Pierson v. Ray*, 386 U.S. 547, 555 (1967)); *see also Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

At the summary judgment stage, "[t]he question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers, or may require a trial if the facts are in dispute." *Weyant*, 101 F.3d at 852 (citations omitted). Where an issue of probable cause is "factual in nature," it must be presented to a jury. *Moore v. Comesanas*, 32 F.3d 670, 673 (2d Cir. 1994) (citations omitted).

The Second Circuit has indicated that a district court should not conclude as a matter of law that probable cause existed where a "sparse factual record . . . [did] not eliminate the possibility that the defendants initiated the criminal proceeding without probable cause." *Rounseville v. Zahl*, 13 F.3d 625, 630 (2d Cir. 1994). Where a plaintiff "pointed to facts from which a jury could find an absence of probable cause for the . . . arrest," courts in this circuit have found those facts to be sufficient to create a genuine dispute of material fact. *Sassower v. City of White Plains, County of Westchester*, No. 89 CIV. 1267 (MJL), 1995 WL 222206, at *5 (S.D.N.Y. Apr. 13, 1995) (discussing plaintiff's affidavit denying that she had yelled or sworn at defendant police officers, as they claimed in supporting their arrest for disorderly conduct).

Sickles arrested Chillemi on July 8, 2009, for aggravated unlicensed operation of a motor vehicle and possession of a controlled substance. Sickles claims, among other things, that (1) he observed Chillemi driving the car, with Tara as a passenger, and (2) after he placed Chillemi under arrest for aggravated unlicensed operation of a motor vehicle, he searched Chillemi and found a bag of cocaine in his pocket. (Defs.' Mem., Ex. E ("Sickles Tr.") at 22-23, 31-32.) However, Chillemi has submitted sworn statements that (1) Tara was driving the car, and he was just a passenger, and (2) he did not have any drugs in his possession. (Chillemi Decl. ¶¶ 13, 15, 26.) Tara also has testified that she was driving the vehicle on July 8, 2009, not Chillemi. (Tara Tully Tr. at 45.)

These disputed issues of fact clearly preclude summary judgment on the question of whether there was probable cause for the arrest. If Chillemi's version of the events is credited—namely, that he was not driving and did not have cocaine on him—Sickles

clearly would not have had probable cause for the arrest.[13]

Accordingly, summary judgment on the false arrest claim is denied.

b. Other Fourth Amendment Claims

Chillemi's other Fourth Amendment-based § 1983 claims are that (1) there was no basis to stop him and search him at the house, and (2) Sickles fabricated evidence against him.[14]

With respect to the unreasonable stop and search claim, in general, "[t]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). In examining whether an officer had reasonable suspicion at the time of the stop, courts "assess the totality of the circumstances supporting the investigatory stop . . . to decide whether the officer's suspicion of wrongdoing has an objective and particularized basis." *United States v. Muhammad*, 463 F.3d 115, 121 (2d Cir.

2006). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). Like probable cause, whether "reasonable suspicion exists is an objective inquiry; the 'actual motivations of the individual officers involved' in the stop 'play no role' in the analysis." *Holeman v. City of New London*, 425 F.3d 184, 190 (2d Cir. 2005) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)).

This Fourth Amendment claim is premised on the same evidence that plaintiff uses to support his false arrest claim: namely, that Sickles lacked any basis for the initial stop because plaintiff was not driving the car and, thus, there also was no basis for the search incident to arrest. Thus, if plaintiff's version of the events is accepted by the jury, Sickles would not have had the required "reasonable suspicion" to stop Chillemi, and no legal basis to search him. Accordingly, in light of the parties' genuine dispute as to material facts regarding the circumstances

---

[13] As noted *supra*, Chillemi also asserts that there was no probable cause for the arrest because he had a valid license at the time of the arrest. Defendants have submitted evidence to rebut Chillemi's contention on this issue. In particular, in addition to Sickles's testimony that Chillemi's license was suspended, defendants have offered the New York State Police Information Network ("NYSPIN") report containing Chillemi's criminal record as an exhibit to their motion for summary judgment, showing that Chillemi's license was suspended when the report was run on the date of Chillemi's arrest. (NYSID Report at 2.) In any event, the resolution of this factual issue in defendants' favor would not be dispositive on the question of probable cause for the arrest. In other words, even assuming Chillemi's license was suspended, Sickles would not have had probable cause to arrest Chillemi for unlicensed operation of the vehicle if (as Chillemi claims) Sickles fabricated the

fact that he observed Chillemi driving the vehicle, and Chillemi was not driving at all.

[14] In their motion for summary judgment briefing, defendants do not specifically address the claim that Sickles fabricated evidence by producing the bag of cocaine that he claimed to find in Chillemi's pocket. Defendants do, however, move for summary judgment on the "illegal search and seizure claim[]." (Defs.' Mem. at 15). Defendants argue that the search incident to arrest was lawful and that, regardless, the remedy for an unlawful search or seizure would be suppression of evidence at trial, rather than recovery through a § 1983 action. (*Id.* at 16.) The Court will treat defendants' arguments relating to the illegal search as also encompassing Officer Sickles's purported fabrication of evidence.

surrounding the arrest, the Court also denies summary judgment on Chillemi's claim for unreasonable search and seizure based upon the stop and search.

With respect to Chillemi's § 1983 claim for fabrication of evidence, the Second Circuit has ruled that there is a "right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity," and that the violation of that right is actionable under § 1983. *Zahrey v. Coffey*, 221 F.3d 342, 349, 357 (2d Cir. 2000). The Second Circuit requires that, to succeed on such claims, it must be "reasonably foreseeable that the false evidence will be used to deprive the defendant of liberty." *Id.* at 357.

Chillemi claims that Sickles feigned finding a bag of cocaine in his pocket during the search incident to arrest, and that Sickles himself produced the bag. (Pl.'s 56.1 ¶ 62.) In *Zahrey*, the Second Circuit provides examples of alleged misconduct that were found to have deprived § 1983 plaintiffs of their liberty, such as when "a prosecutor places in evidence testimony known to be perjured" and the accused is then convicted and sentenced. 221 F.3d at 350. Chillemi alleges similar misconduct: he claims that Sickles included information in his Misdemeanor Information about having found a bag of cocaine that Sickles knew to be false (because he fabricated the story). As noted, Chillemi also contends that Sickles fabricated that he observed Chillemi driving a vehicle without a license, and that Chillemi made incriminating post-arrest statements. Chillemi was then convicted and sentenced for the charges that resulted from Sickles's arrest. If plaintiff's evidence is credited, this claim could be found to satisfy the causation

requirement for a § 1983 action: that the alleged misconduct in fact resulted in the deprivation of liberty at issue. *Zahrey*, 221 F.3d at 350 (explaining that, even where a government actor's misconduct has been established, "no deprivation of liberty occurs unless and until the jury convicts and the defendant is sentenced").

As the Court concluded with respect to the other Fourth Amendment claims, there is a genuine dispute of material facts as to whether Sickles fabricated evidence that led to Chillemi's deprivation of liberty.[15] The Court, therefore, denies summary judgment as to this claim.

c. Compelled Self-Incrimination Claim

Chillemi claims that his Fifth Amendment right to freedom from compelled self-incrimination was violated. (Compl. ¶ 1.) In his opposition to summary judgment, however, Chillemi explains that his rights were violated because he "never made the statements that are currently being used against him." (Pl.'s Mem. at 19-20.) Chillemi clarifies that he has not alleged that his Fifth Amendment right was violated through coercion or torture. (*Id.* at 19.) Given that Chillemi does not allege that he made any statements to the police, he cannot possibly assert a compelled self-incrimination claim; rather, as noted *supra*, his allegations regarding the fabricated self-incriminating statements are properly brought under the Fourth Amendment. Accordingly, summary judgment is granted in defendants' favor on the compelled self-incrimination claim.

2. Liability of Kiernan and Tully

Chillemi brings his § 1983 claims against defendants Kiernan and Tully based on their

---

[15] Chillemi also asserts Fourth Amendment claims against defendants Tully and Kiernan. The issues

concerning their alleged personal involvement are discussed *infra*.

supervisory liability and failure to intercede. Chillemi alleges that defendants Kiernan and Tully had supervisory power over Sickles, (Compl. ¶¶ 12, 14, 88), and knew Officer Sickles's statements in the General Traffic Complaint and Misdemeanor Information against Chillemi were incorrect, (*id.* ¶¶ 32-33). Further, Chillemi's allegations suggest that the motive behind the arrest was *all three* "defendants' disapproval of [Chillemi's] romantic relationship with Defendant Tully's daughter." (Defs.' 56.1 ¶ 99.)

Defendants claim that Kiernan and Tully should not be held liable for the alleged misconduct because Chillemi failed to establish their personal involvement, as is required to bring these § 1983 claims against them on the basis of their supervisory liability. (Defs.' Mem. at 17-18.) As discussed below, the Court concludes that there is sufficient evidence of personal involvement with respect to Kiernan that preclude summary judgment with respect to the Fourth Amendment claims against him. However, given the lack of any evidence of Tully's personal involvement in the arrest or the alleged fabrication of evidence, summary judgment is warranted in his favor on all claims.

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citations omitted). In other words, "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior*." *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003). Supervisor liability can be shown in one or more of the following ways: "(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." *Id.* at 145 (citations omitted).

With respect to Kiernan, plaintiff has set forth several pieces of evidence to support his claim that Kiernan was personally involved in the alleged constitutional violations in this case. First, there is evidence that Kiernan arrived at the scene shortly after Chillemi's arrest by Sickles. Second, Chillemi asserts that Kiernan fabricated statements by Chillemi at the scene in an effort to support the false arrest. Third, Kiernan administered the oath for the General Traffic Complaint and Misdemeanor Information signed by Sickles on July 8, 2009. As to Kiernan's knowledge of the allegedly unconstitutional nature of Sickles's search and arrest, in addition to the alleged fabrication of statements by Kiernan, plaintiff points to involvement of both Sickles and Kiernan in his 2007 arrest and the circumstances surrounding that encounter, as well as the fact that Tara told Chillemi that Kiernan is her godfather. In other words, Chillemi asserts that the totality of the evidence demonstrates that Kiernan knew that Sickles had a vendetta against Chillemi because of Chillemi's relationship with Tara and that Sickles was intent upon fabricating evidence to support an arrest against Chillemi. Thus, Chillemi contends that Kiernan is liable based upon his alleged grossly negligent failure to supervise Sickles and/or intercede to stop Sickles's unconstitutional acts once he arrived at the scene. The Court concludes that, construing the evidence most favorably to plaintiff, plaintiff has raised genuine issues of material fact as to (1) whether Kiernan was aware that Sickles was fabricating evidence against Chillemi on July 8, 2009, (2) whether

Kiernan himself fabricated incriminating statements by Chillemi on that date, and (3) whether Kiernan was grossly negligent in his supervision of Sickles and/or had an opportunity to intercede to prevent the false arrest and detention once he arrived at the scene on July 8, 2009. Accordingly, summary judgment is denied as to Kiernan on the Fourth Amendment claims.

With respect to Tully, defendants have submitted evidence that Tully (1) had no involvement in the investigation of Chillemi, (2) was not present at either the 2007 arrest or 2009 arrest, (3) never interacted with or met Chillemi, and (4) never had any conversations with Sickles or Kiernan about Chillemi. Plaintiff has submitted no admissible evidence to controvert defendants' submissions. Instead, plaintiff simply speculates that, because Chillemi's relationship with Tully's estranged daughter was the purported motivation of the unconstitutional conduct by Sickles, Tully must have had some unknown involvement. Such sheer speculation, however, does not create a genuine dispute as to material facts that precludes summary judgment. Even construing the evidence most favorably to Chillemi, no rational juror could find that Tully participated in (or was even aware of) the purported constitutional violations by Sickles. Accordingly, Tully is entitled to summary judgment on all claims.

3.    Qualified Immunity

All three individual defendants also argue that they are entitled to qualified immunity. As a threshold matter, the Court has concluded that Tully is entitled to summary judgment on all claims because of the lack of any evidence of his personal involvement. Thus, the Court need not address the qualified immunity issue as it relates to Tully. With respect to defendants Sickles and Kiernan, the Court concludes that summary judgment on qualified immunity grounds is unwarranted given the disputed issues of fact in the record as to whether Sickles and Kiernan were involved in the intentional fabrication of evidence to support Chillemi's arrest in July 2009.

The Supreme Court recently affirmed that "[q]ualified immunity attaches when an official's conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)). The Second Circuit has held that "a right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004) (quoting *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003)); *see also McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 278 (2d Cir. 1999). Defendants claim that it was objectively reasonable for Sickles to believe that he acted lawfully in stopping, searching, and arresting Chillemi, and that Kiernan acted in an objectively reasonable manner in signing off on his arrest.

The Second Circuit has held that courts should cloak defendants with qualified immunity at the summary judgment stage "only 'if the court finds that the asserted rights were not clearly established, or if the evidence is such that, even when it is viewed in the light most favorable to the plaintiff[] and with all permissible inferences drawn in [his] favor, no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right.'" *Ford v.*

*McGinnis*, 352 F.3d 582, 597 (2d Cir. 2003) (quoting *Williams v. Greifinger*, 97 F.3d 699, 703 (2d Cir. 1996)); *see also Oliveira v. Mayer*, 23 F.3d 642, 649 (2d Cir. 1994) ("Though [qualified] immunity ordinarily should be decided by the court, that is true only in those cases where the facts concerning the availability of the defense are undisputed; otherwise, jury consideration is normally required.") (citations omitted).

Defendants argue that, even if Sickles lacked probable cause, he is entitled to qualified immunity. (Defs.' Mem. at 21.) Even without probable cause, a police officer is entitled to qualified immunity "so long as 'arguable probable cause' was present when the arrest was made." *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016) (quoting *Zalaski v. City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013)). "A police officer has arguable probable cause 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'" *Id.*

The Second Circuit has affirmed that "'[a]rguable' probable cause should not be misunderstood to mean 'almost' probable cause. . . . If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer." *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007). Under this standard, an arresting officer is entitled to qualified immunity, as a matter of law, only "if the *undisputed facts* and all permissible inferences favorable to the plaintiff show . . . that officers of reasonable competence could disagree on whether the probable cause test was met." *McClellan v. Smith*, 439 F.3d 137, 147-48 (2d Cir. 2006) (citations omitted).

In arguing that they are entitled to qualified immunity, defendants do not contest the existence of a constitutional right; rather, they argue that reasonable people would disagree about the constitutionality of their actions. However, as discussed *supra*, viewing the evidence most favorably to plaintiff, including drawing all reasonable inferences in his favor, Chillemi has created a material issue of fact as to whether defendants Sickles and Kiernan participated in the fabrication of evidence to establish probable cause to arrest Chillemi. Under the circumstances of this case, these disputed issues of fact also preclude summary judgment on the issue of qualified immunity. In particular, if Chillemi's sworn version of the facts is accepted by the jury—namely, that Sickles had decided to pursue the car even though he had seen Tara (not Chillemi) driving, and that he fabricated the fact that he had found cocaine on Chillemi—Sickles clearly would lack even arguable probable cause, and no reasonable officers would disagree on the constitutionality of such conduct. Similarly, if Chillemi proves that Kiernan was aware of Sickles's fabrication of evidence at the scene of the arrest and failed to intervene in Sickles's decision to detain Chillemi, Kiernan also would not be protected by qualified immunity.

This conclusion is consistent with well-settled Second Circuit precedent. For example, in *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123 (2d Cir. 1997), the Second Circuit held that the district court erred in granting summary judgment in favor of the police officers on qualified immunity grounds with respect to the alleged fabrication of evidence. *Id.* at 130. The Court found qualified immunity unavailable because conspiring to fabricate and forward to prosecutors a known false confession "violates an accused's clearly established constitutional right, and no reasonably competent police officer could believe

otherwise." *Id.*; *see also McSherry v. City of Long Beach*, 423 F.3d 1015, 1022 (9th Cir. 2005) (reversing grant of judgment as a matter of law on qualified immunity grounds where plaintiff "raised a disputed issue of fact as to whether defendants fabricated some of the evidence used to obtain [plaintiff's] conviction"); *Kingsland v. City of Miami*, 382 F.3d 1220, 1233 (11th Cir. 2004) (reversing summary judgment on qualified immunity grounds and noting that "because a jury question exists as to whether the defendants constructed evidence upon which to base [plaintiff's] arrest, the question whether arguable probable cause for the arrest existed is aptly suited for a jury"). Similarly, in *Jenkins*, the Second Circuit found that some of the facts alleged to provide a basis for probable cause were "vigorously disputed," including facts that were "clearly material" to the district court's finding of arguable probable cause. 478 F.3d at 89. The Second Circuit, therefore, found that the district court had erred in part in granting summary judgment. *Id.* at 91.

Accordingly, given the disputed issues of fact in the record regarding the alleged fabrication of evidence by Sickles and Kiernan to support Chillemi's arrest, the motion for summary judgment on qualified immunity grounds is denied.

4. The Town's Liability

Defendants request that the Court grant summary judgment on the *Monell* claim against the Town on the grounds that "Chillemi has not articulated a [Town] policy or practice" that led to the deprivation of his rights. (Defs.' Mem. at 12.) Further,

defendants argue that municipal action directed at one individual does not qualify as a policy, custom, or practice. (*Id.* at 13-14.) As set forth below, the Court concludes that there are issues of fact that preclude summary judgment on the *Monell* claim against the Town with respect to Chillemi's Fourth Amendment claims.[16]

A municipal entity may be held liable under § 1983 where the plaintiff demonstrates that the constitutional violation complained of was caused by a municipal "policy or custom." *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658, 694 (1978) (emphasizing that the municipal policy must be the "moving force of the constitutional violation"). "The policy or custom need not be memorialized in a specific rule or regulation." *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (citing *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992)). Instead, constitutional violations by government officials that are "persistent and widespread" can be "so permanent and well settled as to constitute a custom or usage with the force of law, and thereby generate municipal liability." *Sorlucco*, 971 F.2d at 870-71 (quoting *Monell*, 436 U.S. at 691) (citation omitted). In addition, "[t]he failure to train or supervise [municipal] employees may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the [municipal] employees interact." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Deliberate indifference exists when the plaintiff establishes that (1) "a policymaker knows 'to a moral certainty'

---

[16] As noted above, Chillemi's remaining § 1983 claims are for false arrest/imprisonment, unreasonable search and seizure, and fabrication of evidence. Thus, the Court need not address the Town's liability under *Monell* with respect to Chillemi's compelled self-incrimination claim. *See Segal v. City of New York*,

459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct.").

that [municipal] employees will confront a particular situation"; (2) "the situation either presents the employee with 'a difficult choice of the sort that training or supervision will make less difficult,' or 'there is a history of employees mishandling the situation'"; and (3) "the wrong choice by the [municipal] employee will frequently cause the deprivation of a citizen's constitutional rights." *Id.* at 195-96 (*quoting Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992)). The Supreme Court has reiterated that "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (*quoting Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 409 (1997)). However, "in a narrow range of circumstances" where unconstitutional actions are the obvious consequence of a failure to train, "a pattern of similar violations might not be necessary to show deliberate indifference." *Id.* at 63 (quoting *Bd. of Cty. Comm'rs of Bryan Cty.*, 520 U.S. at 409). Moreover, a single action also can "provide[] a basis for municipal liability where it is taken by, or is attributable to, one of the city's authorized policymakers." *Amnesty Am.*, 361 F.3d at 126. In order to be deemed a "policymaker" or "decisionmaker," an official must "possess[] final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). It is important to emphasize that a municipal entity may be held liable only where the entity itself commits a wrong; "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691; *see also Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation.").

As a threshold matter, it is unclear from the record whether Kiernan, as the supervisory sergeant of the Town's SCU in 2009, would qualify as an authorized policymaker, in terms of establishing certain policies governing his unit's arrests, which could form the basis for a *Monell* claim in connection with the 2009 arrest. In any event, plaintiff has put forth evidence that creates a genuine issue of disputed fact as to whether there was a failure to supervise Sickles that caused the alleged unconstitutional violations in this case with respect to the July 8, 2009 arrest. First, with respect to the failure to supervise, plaintiff points to the circumstances surrounding the arrest itself and his observation that Kiernan, upon arriving at the scene, not only failed to supervise Sickles, but also fabricated statements by plaintiff that would support the unlawful arrest. Second, the Court notes that Kiernan pled guilty to, *inter alia*, multiple charges (Charge 4, Charge 10, Charge 11) that relate to his supervision of Sickles and Kiernan's competence.[17] (*See* Chillemi

---

[17] Charge Four alleged: "Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 9 on or about October 25, 2011, when Lieutenant James Kiernan received a call for help by Police Officer Sickles's wife, Erica Sickles, stating that her husband was suffering from the side effects of several prescribed medications that he was taking, that he was unable to drive a car without falling asleep, that he had fallen asleep at their kitchen table with his duty gun in hand prior, and that she felt she and her children were in danger. Upon receiving this complaint Lieutenant Kiernan failed to take decisive action for over 18 hours and permitted Police Officer Sickles to work full duty for the remainder of his 4 x 12 tour that date. Lieutenant James Kiernan's conduct constitutes incompetence." (Chillemi Decl., Ex. 7 at 3.)

Decl., Ex. 7.) The Court further notes that other disciplinary charges (to which Kiernan did not plead) also implicate his alleged failure to properly supervise Sickles. Although these charges relate to 2011, they certainly have probative value as to whether there was proper supervision of Sickles in 2009.[18] In short, construing the evidence most favorably to plaintiff, there is a disputed factual question as to whether supervisors (including Kiernan) were deliberately indifferent to the supervision of Sickles that would ensure that he followed proper police procedure in connection with his arrests, and whether that deliberate indifference led to an unconstitutional arrest and search on July 8, 2009, as well as the fabrication of evidence.

In sum, the Court concludes that there remain genuine disputes as to material facts necessary to determine whether there is municipal liability against the Town under *Monell*. Accordingly, the Court denies summary judgment on the *Monell* claim.

## IV. CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary judgment on the compelled self-incrimination claim and on all claims as to Tully, and denies the motion in all other respects.

SO ORDERED.

[signature redacted]

JOSEPH F. BIANCO
United States District Court

Dated: December 20, 2017
Central Islip, NY

* * *

Plaintiff is represented by Thomas Anthony Telesca of Ruskin Moscou Faltischek PC, East Tower, 15th Floor, 1425 Rexcorp Plaza, Uniondale, New York 11556. Defendants are represented by David H. Arntsen, Jeltje DeJong, John M. Shields, and Kelly E. Wright of Devitt Spellman Barrett, LLP, 50 Route 111, Smithtown, New York 11787.

---

Charge Ten alleged: "Lieutenant James Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.9 on or about October 26, 2011, when Lieutenant James Kiernan, Police Officer Sickles' [sic] direct supervisor, failed to properly adjust Police Officer Sickles' [sic] work schedule to reflect time off from his regularly scheduled 4 x 12 tour. This is incompetence." (*Id.* at 5.)

Charge Eleven alleged: "Lieutenant Kiernan violated Southampton Town Police Department Rules and Regulations, Article VIII, Rules of Conduct, Rule 1.9 on or about October 26, 2011, when Lieutenant James

Kiernan failed to properly secure Police Officer Sickles' [sic] duty weapon, a Glock .40. Lieutenant James Kiernan permitted Police Officer Sickles to secure his duty weapon in the Street Crime Office locker where Officer Sickles continued to have full access to the weapon. This is incompetence." (*Id.*)

[18] In addition, Chillemi points to news sources that he argues show more pervasive wrongdoing and deliberate indifference within the SHTPD. (*See* Pl.'s Mem. at 16-17 (citing Chillemi Decl., Ex. 6).) However, the Court does not consider these news articles because they are inadmissible.